325-0449, Chusai Alkafaween v. Village of New Lenox, Jacob Klepp, and David DiLetto, Appalese. Counsel for the Appellant, you may proceed. Justices, good morning. May it please the Court, Jack Cusciato on behalf of Plaintiff Appellant Chusai Alkafaween. Justices, we're here today on an appeal brought by the Appellant, Plaintiff Chusai Alkafaween. The circuit court, Judge Daniel Rippey, improperly granted summary judgment when there was a genuine issue of material fact that existed as to the immunities relied upon by Appellee, Village of New Lenox, specifically and most prominently the interplay between Section 412 and Section 2202, the latter section of the Tort Immunity Act, that has a willful and wanton application and exception. The Court found that on the evening of the event, the two officers from the Village of New Lenox, Sergeant David DiLetto and Officer Klepp, were providing aid and assistance to Chusai Alkafaween. The evidence and record in this case, Justices, shows the complete opposite. The officers lured him to the back of a police SUV. The officers admitted that they believed that he was suffering from a mental health crisis. And when placing him in the back outside of his ear reach, the officers devised a plan to bring him into Cook County and to use Sergeant DiLetto's own words back at the hospital, dump him back into Orland Park, admitting that they were frustrated that the Orland Park Police Department earlier in the evening took Mr. Alkafaween into New Lenox at Silver Cross Hospital. The cases, Your Honor, Justices, that Plaintiff Appellant relies upon are 2023 opinion from the 3rd District, Andrade v. City of Kankakee, Glover v. City of Chicago, and Ferragato v. Village of Olympia Fields. In each of those seminal cases, probative cases that address the interplay between Section 2202 and Section 4102, a seminal inquiry is noted. Whether or not the officers responded in execution and enforcement of the law, and or whether or not the officers controlled the movements of an individual. In this specific case, that certainly is true. The officers responded to Silver Cross Hospital in execution and enforcement of a criminal trespass complaint and removed Kousai Alkafaween from the premises, later devising a plan to bring him to a location he was completely unfamiliar with on a cold December evening without a jacket and leave him there, where he indicates to the officer at the scene, I don't know where I am, can you help me with that? Where the officer then instructs him to walk down a road where he's later hit by a vehicle. The officers. The hospital release document indicated that he was released to home, correct? Justice, I'm having a little difficulty hearing you. I'll try it again. Thank you. Thank you. The document indicated when he was his release from the hospital indicated released to home, correct? That is correct. Justice. And both of the officers admitted they could have gone into the hospital to learn that Kousai attempts to hand them his wallet for his ID. The officers both had access to the lead system, which Deputy Chief Davis indicated they could have looked up his address and the officers indicate they've concocted an argument. Well, we were trying to get him closer to home. And the reality is, Justice, if you don't know where somebody lives, how do you know whether or not you're getting them closer to home? And when Sergeant DiLetto expanded upon that, he created a narrative indicating, well, we wanted to bring him someplace where there were homes so he could ring doorbells and try to get a phone and help himself. Also admitting that he had his own phone, but wouldn't allow him to use it because of COVID. Certainly that is not providing aid and assistance to an individual to drop them off in an area suffering a mental health crisis alone. And then to say that that individual is supposed to walk throughout the Orland Park community, ringing doorbells at midnight, seeking a phone when the officer had one. Counsel, what's the obligation of the police department when a patient is released to home to give them a ride home? Justice Holdreds, that's addressed by Deputy Chief Davis. Deputy Chief Davis indicated that there were infinite possibilities of where he could have been taken, one of them home, or placed under a civil commitment or brought to the actual police station. When recognizing that he was suffering a mental health crisis, there is an obligation on the officers when they put him within their control to not act in a willful and wanton manner, but to protect an individual. Bring them to a police station, place them under a civil commitment, or as the officers indicate, there is a behavioral hospital that New Lenox officers are aware of where they could have brought him. Mr. Alcafuene never asked to be taken to this remote parking lot and told to be walked down Wolf Road at midnight. Well, we understand all of that, but I'm going to get back to my original question. How did he get to the hospital? He was taken to the hospital after he was clearly having a manic episode in a gas station by the Orland Park Police Department who recognized he needed help. Okay, so he was in their care and custody at the gas station and then transported to the hospital. That is correct, Justice. Thank you. Thereafter, the New Lenox Police Department was called when he wanted to continue to remain at the hospital. And the seminal inquiry here is whether or not they were executing and enforcing the law. These officers did not respond, saying, we're here to provide aid and assistance. Their own post-incident police reports, failing to mention, which both were disciplined for, that he was hit by a car, one of the officers indicating that he was asked to be taken to the parking lot, which certainly is not true, indicate that they were there for criminal trespass to property justice, which is essential, as the 3rd District in Andrade found in Andrade v. City of Kankakee. The court found in Andrade that the plaintiff failed to plead, nor could the plaintiff factually plead that the officers that were protecting the Kankakee Courthouse where a shooting occurred were executing and enforcing the law. I'm quoting exactly from the Andrade opinion. It indicates, the incident plaintiffs have not identified any laws being enforced by defendants as to plaintiffs, nor were defendants in control of or directing plaintiffs' movements at the time of the shooting. In the incident case, this same holding from Andrade can be applied. These officers responded in execution and enforcement of the law, and these officers also, although the second prong isn't needed to be established, both prongs are, certainly controlled his movements. They took him to a location that he did not know where he was being taken. At that location, when he's asked, do you know where you are, he says, no, can you help me with that twice? The officer, for some reason, directed him to walk down Wolf Road, where he was later hit, indicating there would be... Yes, Justice. Yeah, I think now we're getting into beyond, I think, Judge Holder's question, but here's my question. Is it of any import that they chose not to arrest him? He didn't get arrested. They didn't charge him with trespassing, even though they were there to investigate the trespass. Justice Peterson, certainly not. That would imply 4107 immunity. Plaintiff never alleges that he should have been detained or arrested. What plaintiff alleges is that when you know somebody is suffering from a mental health crisis, with the officers admitting they did not know at the time whether he was a danger to himself or others, you have to protect that person and place them under a civil commitment. You certainly don't just drive them to this parking lot and leave them there. So we've never alleged a failure to arrest or a failure to detain, which Rodriguez v. Village of Park Forest speaks to, which is a case relied upon by the appellee. But that's never been an argument. The argument here is these officers were enforcing the law and did so willfully and wantonly when they knew there were infinite possibilities, Deputy Chief Davis's own testimony. Instead of bringing him and just leaving here, you should have brought him to a police station. You should have brought him to a behavioral hospital or at the very least grabbed his wallet or utilized your equipment, your lead system to learn where he lives and bring him home, not to just leave him by himself in crisis. One of the cases, Justices, that I think is very instructive here is Fadegato v. Village of Olympia Fields. In that case, police officers responded to a residence for a domestic dispute. The court clearly found that they were executing and enforcing the law. They asked the intoxicated unruly male to exit the premises, certainly to separate this couple during this domestic dispute, instructed him to get in his car. He later drove off and unfortunately caused a collision, being intoxicated with another driver. It's very akin to the facts in this case. The officers respond to a location and execution and enforcement of the law and then even more control in his movements. Don't only instruct Mr. Kusai to leave, but actually take him off the property in their police vehicle, bring him to this remote parking lot, and then there instruct him to walk down the street where he's later hit. Fadegato found that the interplay between Section 2202 was certainly at play because the officers responded in execution and enforcement of the law and controlled their movements. The seminal inquiry, as Andrade holds specifically, the question of whether a public employee is executing or enforcing the law under Section 202 rather than failing to provide adequate police services under Section 4102 is typically a question of fact. The next level of analysis that it appears appellate courts go to is, were those officers enforcing or executing the law and responding to the scene? And in this case, they were. Now, I understand that appellee, through argument, wants to create this narrative that we had stopped enforcing the law. Post-incident reports give no mention whatsoever that their function had switched. But even if this court were to believe that these officers were trying to provide aid and protection, it's certainly the complete opposite of aid and protection. When Mr. Alcafuene at the scene indicates, can you help me with that? I don't know where I am. He communicates and provides actual notice to the police officers. I need help not to be abandoned here in an area I don't know where I am, and then to be instructed to walk down a dark road, busy traffic on Wolf Road with no real sidewalk, further control, further control of his movements, but in continuation of enforcing the law. And you see that specifically in the third district in Andrade, where the third district made it very clear that one of the reasons they upheld and affirmed the 2619 dismissal is that the plaintiff did not plead, nor could they argue, based on the facts that the sheriff's department at the courthouse, protecting the courthouse, was enforcing any law at the time. This case is completely distinguishable from Andrade, but the third district's holding in Andrade certainly is applicable, given the enforcement of the law, which justices we also see by the first district in a 2023 opinion in Glover v. City of Chicago, where officers responded to a bar, two gentlemen were in some sort of altercation. They responded for a disturbance call. They separated the two gentlemen. One was told to walk one direction. One was told to go home. And unfortunately, one of the patrons turned around and 39 seconds later fired at another patron. And the court found that because those officers came to the scene in enforcement of a disturbance call, and also directed the movements, told individuals where to go, there was a genuine issue of material fact as to whether section 4102 or section 2202 applies, which we consistently see between Fatigado, Glover, and the third district's opinion in Andrade. Very brief here, your honors. The cases that appellees rely upon, for example, Rodriguez v. Village of Park Forest is a rule 23 opinion. And aside from being a rule 23 opinion, it focuses on section 4107 in a failure to make an arrest at a DUI stop. As I've noted, appellant plaintiff has never alleged that he should have been arrested. You also take a look at the Payne case cited by the City of Chicago, where officers responded to a man that had some suspected overdose. Those officers were not there to arrest the man. They were not there to enforce law. They were there to provide aid and assistance to somebody that had an overdose. So both of those cases are inapplicable. The court has found that it's typically a genuine issue of material fact in Andrade. In looking at this inquiry, there's certainly facts in this case where these officers were enforcing the law, and they certainly were not providing aid and protection. If anything, the officer, Sgt. Toledo, makes it very clear when he talks to the staff back at the hospital that he was frustrated, as his own deputy chief admitted, that the Orland Park Police Department brought Kusai Al-Khufuyn into Silver Cross, and to use Sgt. Toledo's own words, I brought him to the county border and instructed one of my deputies to dump him there. That's not aid and assistance, such as an officer jumping into a lake, observing somebody drowning, or an officer providing Narcan to an individual that has an overdose. This was a cruel, malicious, and intentional plan to bring someone to a location and simply, I think a jury could easily find, get back at the Orland Park Police Department, frustrated that they brought, which clearly the New Lenox Police saw Mr. Al-Khufuyn as a problem, and dump him to use the officer's own words. Back into Orland Park at the county border. Justices, I thank you for your time. If there's any questions, please let me know. Any questions from the court? No further. I do not. You'll have time in reply, counsel. Thank you, Justice Holdridge. Counsel, Berkham?   Bersani. That's fine print on my screen there. Excuse me. You may proceed. No problem, Justice. Thank you, and thank you, Justices, for the opportunity to present an oral argument this morning, and may it please the court. My name is Mike Bersani. I represent Defendants Appalese in this case. The primary issue is whether Sergeant Toledo and Officer Klepp provided a police protection service, as opposed to performing a traditional law enforcement function or activity at the time of the plaintiff's injuries. It's our position that Judge Rippey, the trial court, correctly found that the officers were performing a community caretaking service, which by definition is a police protection service under the case law in Article 102, I'm sorry, Article 4, Section 102 of the Tort Immunity Act. To the extent the plaintiff is claiming still in this case that there was a failure to arrest that caused the injuries or a release from custody, Section 4107 of the Tort Immunity Act would provide absolute immunity for those activities. And then the third issue, and it's an alternative issue, but it's equally as important, it's our position that the defendants asserted, I'm sorry, that Sergeant Toledo made discretionary decisions based on certain policy interests or after balancing certain policy interests, and that, therefore, he is not liable under Section 2-201 of the Act. Now, while the trial court did not address that alternative Tort Immunity provision, of course, this court can affirm on any basis supported by the record, and we did make that argument both in the summary judgment proceedings and on appeal. I'd like to address the 4102 argument first because I think it's the primary issue in the case. The legislative policy that's embodied in that statute is very clear. The police cannot be put in the untenable position of guaranteeing or ensuring the personal safety of every person in the community. That's the purpose of that statute. And the language of the statute, and I think the disconnect with the plaintiff's argument here, is that that statute covers not just when a police officer wholly fails to provide a police protective service. To protect somebody from third party harm, but also when the officer actually provides a police protection service, but does so inadequately. And that's essentially the core of the plaintiff's argument here, the core of the allegations in his complaint, and the arguments he made on summary judgment, and the arguments in this court. If you listen to the plaintiff's argument, he said, well, the officer should have should have given Mr. Alcafuene, should have determined where he lived and given him a ride home to Chicago or Orland Park or whatever. Or they should have taken him to a nearby police station. Or Sergeant DiLetto should have called his supervisor for counsel. Or, and this is the litany of things they allege in their complaint, the officer should have called a social worker to come help with the potential for this man, that this man was having a mental health crisis. There's even allegations and arguments that the police should have returned him back into the ER at Silver Cross Hospital or taken him to a mental health facility, or even civilly committed him. Now, Your Honors, I think I'll acknowledge that it's fair to criticize Sergeant DiLetto for the discretion that he exercised here. His own department did, by reprimanding him for discretion that he exercised. He even criticized himself in his deposition, stating in retrospect, a couple years after the fact, now knowing what happened, that maybe he could have done things a little differently. And even Judge Rippey, in his decision in deciding summary judgment, commented off the cuff, I think, but nonetheless, plenty went wrong here. But Judge Rippey was absolutely correct in finding, at its core, the police officers were performing a community caretaking service and were not enforcing any laws at the time of the injuries. And that's the key trigger here, is what was happening at the time that Mr. Alcapuline was tragically and unfortunately, obviously, hit by this car. The plaintiff, throughout his entire argument, has completely undermined the argument that the officers were enforcing the law. The plaintiff was not in custody at the hospital. What had happened was the plaintiff had been arrested hours earlier by the Orland Park Police. Excuse me, Mr. Barsani. Yes. At the time that the plaintiff was in the back seat of the car, the police car, he had started to walk away when the police officers directed him back into the back of the car. He's in the back seat of the car. And as we all know, he cannot exit that vehicle when the doors are shut. So at that point, he has nowhere to go and he begins yelling and screaming. Do you agree? I do not. I do not entirely agree with what Your Honor just said. I don't think that's the exact record. What happened was that, and this is on the body-worn camera at 2311 to 2314. This is Sergeant DeLetto's body cam. After repeatedly asking Mr. Alcapuline, you know, can we get you a ride? Can we find someplace to take you? The plaintiff says, I'm cold. I need anything. I need a car. At that point, Sergeant DeLetto says, all right, well, we can get you part of the way to Orland Park. How's that sound? Or do you want to walk? And the plaintiff said, yeah, that's good. And he started to walk towards, if you look at the body cam video, he started to walk towards a car that was a security officer car for the hospital. I think by appearance, it looks like it's a police car. And then Sergeant DeLetto says, no, not that car. The squad car that's off to the left. And you can see this on the video. So then he walks to the squad car and they place him inside the squad car. He was not handcuffed. He was not under arrest. He was not handcuffed. He was not even searched before being placed in the squad car. He was not detained against his will. Based on that colloquy between Sergeant DeLetto and Mr. Alcafalene, I think Judge Rippey correctly found that when given the option to either walk or receive a ride, Mr. Alcafalene voluntarily chose a ride and he got in the squad car. And then Judge Rippey correctly found that that falls within a community caretaking function. There was no law being enforced at that point in time. But didn't that happen, though, after Mr. Alcafalene tried or asked to go back into the hospital and they wouldn't let him. One officer, they said, no, you can't. And one officer actually positioned himself to stop that. And he ends up in the squad. Does that matter? Well, I think that's part of the totality of the circumstances, Your Honor. Sure, because they're still trying to get him a ride at the end of the day. Well, could it also be said they are still trying to remove him from the hospital? The hospital didn't want him there. That's why they called the police there to remove him. They may have chose not to arrest him. And that's why I asked the question. Is it of import that they chose not to arrest him and instead removed him as the hospital requested to another location? Yeah. And I would disagree respectfully with Your Honor's characterization of that he was removed from the hospital. Because when you when you go back to the beginning of this encounter, when Sergeant Delato entered the hospital, when he got the information from the security staff and he first encountered Mr. Alcafalene from the get go, Sergeant Delato was trying to provide him assistance. He realized this man was not really trespassing. He just needed help and assistance and that he voluntarily then left the hospital and went outside the hospital premises. Even the plaintiff's own liability experts, Scott Defoe, agreed in his deposition that at that point, Mr. Alcafalene was not trespassing. So there was no there was no enforcing of any trespass law at that point. So Your Honor is correct that he at one point he briefly tried to get back to the hospital and the officer's like, no, don't go back in there. Let's try and get you a ride. And Mr. Alcafalene, in fact, agreed instead of walking to accept the ride by the officer. And that's and that's what they did here. And I think that's what's dispositive here. Not to mention the fact that. After Sergeant Klepp dropped him off into the parking lot at Joey's Pizza. An hour, almost an hour elapsed between the point that he dropped him off and when the when this unfortunate accident occurred. So there was a great separation of time, which I think materially distinguishes this case from the Glover case. You're saying that's a break in the act of enforcement of the law. That's exactly right, Your Honor. And that's what Sergeant Leto testified to in his deposition. He said his function change. Yes. Did he go to the hospital to investigate a potential trespass? I mean, it wasn't described or worded and the word trespass wasn't used. But certainly that's why they were going there to find out whether this was an actual trespass or not. And that's what they were investigating. What's the elements of a criminal trespass? It would be where, Your Honor, where someone refuses to leave the premises. And the property owner says, you know, you've got to go and they refuse to leave. And that never happened here. That never happened. No security staff said to Sergeant Leto, we want him out now. No one gave Mr. Alkethween an order. You have to leave now. What did they do nonverbally? I'm sorry, Your Honor? What did they do nonverbally? I mean, you don't have to speak. You have to block. Yeah, nonverbally, the entire time, they spoke to Mr. Alkethween and asked him, we can get you a ride. Let's help you out here. And eventually he did leave the hospital premises voluntarily. He wasn't escorted out. He wasn't in handcuffs. He wasn't in custody. He wasn't arrested. As I started to say earlier. Is there something in the facts I just heard someone say that he went back to the hospital? Briefly on the body cam video, as they're outside the hospital premises, they're in the kind of the driveway area right outside the ER doors. They're continually and repeatedly asking Mr. Alkethween, how can we help you? And at one point he briefly turns as if to walk into the hospital. And the officer is like, no, no, no, you don't want to go back in there. Let us get you a ride. And so, but I think the important part is the colloquy that I mentioned earlier, that at 2311 to 2314 on DeLitto's body cam, where DeLitto says, hey, do you want to walk or do you want to ride? And Mr. Alkethween says, you know, I want to ride. And then he eventually gets into the squad car. Now, it's true, Justice Davenport had indicated, well, once you're in the squad car, you can't get out. Well, nobody can get out of the backseat of a squad car, whether you're in there voluntarily or not. Because functionally, there's no locks in the backseat. And that's for an obvious purpose, for officer safety purposes. But that's immaterial here. Okay, let me understand to simplify this a little bit. We're all over this place. They get, the officers get a call to go to the hospital to do what? They received a report that there was a patient who had been discharged, medically discharged from the hospital, but was refusing to leave. Okay, so we got trespass. Potentially, yes. Well, there's a claim, at least by the hospital, that this person is trespassing. Okay, right. And basically, your state's attorney could file a trespass complaint a week later on that scenario, right? If the hospital wanted to press charges, but. No, of course. But no one from the hospital said. I'm sorry. Let's stay with the elements here. Okay. And the point is, the officers show up.  Uh huh. And their purpose of showing up was to. You say investigate a criminal trespass. Yes, yes, sir. Yes. To investigate.  Correct. Okay. So the question then becomes, where does it stop? That active execution and enforcing of the law. I mean, that's what this case is about. Yes, I agree with that justice. I agree with that. Our position is that it stops. Once Mr. Voluntarily exits the hospital premises. And agrees to accept the ride by the officers. Then they completely transitioned. There's no trespass happening here. Even the plaintiff's own liability expert agreed. There's no trespass at that point. And once he gets in the squad car and accepts that ride. There's no law being enforced at that point. So the question is, where does it stop?  Between the fact that they're providing a community caretaking service. There's a clear break. Between the reason why the officers were at the hospital in the first place. And the point that he accepts the ride by his own words on body cam video and gets in the car. There's a clear break between any enforcement of the law and now providing. But community caretaking services. In fact, one of the, one of the analogies that. Judge Rippy had given, which I thought was appropriate. Was well, what if, what if they had gotten a cab? The police get him a cab and then, you know, he leaves the hospital. And then he gets out and he still gets, you know, struck by a car or the police libel. For inadequately providing a community caretaking service under those circumstances. And the answer is no. So there's really no difference in the police giving him a ride or him getting a ride by an Uber or, or a cab. At that point, the fundamentally, they're still providing him. A community caretaking. Community care. You're making a conclusion when you're talking about that, that it's already community caretaking. That's not the issue. I mean, that the issue is whether it is or not. Right. Right. And so. I'm sorry, judge. Yeah, go ahead, please. No, I don't mean to interrupt you. You're on sometimes a little difficult on video. So. No, no, no, no, no, no problem. No, it's, it's, it's our position that judge would be correctly found that there was a transition there that occurred a clear transition between the initial reason why the police were called to the hospital. And eventually within really minutes. Mr. Accepting a ride. And that that transition is what's important here. It's unlike, for example. I see the red light is going on. I'm sorry. Would you like to finish it? Yes. Yeah, I'll just, just briefly. Thank you very much for letting me extend this. Just a couple more seconds. It's unlike the. The Glover case where there was no clear break or at least. You know, on the pleadings, the court could not tell. There was a clear break. So we're at a different procedural. Position than the Glover case. The court needed a more fully developed factual record. Here you have one. It's different than the Agrama case, which is the village adult in case where the man was actually in custody for a DUI, but take it to the hospital for medical reasons. And bad things happen there. There was no clear pivot or transition between. Enforcing the law and a community caretaking service here. Here there is. Your honor. I didn't address the other immunity arguments, but I guess I rely upon my briefs, unless you have further questions. Further questions from the court. I do not. Okay. Thank you very much. You're welcome. Thank you. Council, you may reply. Yes, justices. There's clearly a lot of emphasis from a Pelly. On this red herring argument that there was a pause and then break in transition from enforcing the law to providing a community caretaking function. I think that in itself is a genuine issue of material fact, which the third district recognized an Andrade typically, whether or not for one or two or two to apply is, is a question of fact. But what's very instructive on this issue, specifically, this break is in fact, the fat of God will be village. Of Olympia fields case. In that case, you heard council for a Pelly indicate at the time of the injury, at the time of the injury, they were not enforcing the law. And fat of God. The court found that there was a genuine issue of material fact as to two, two Oh two, when the officers responded to the civil dispute. Domestic dispute removed the unruly intoxicated male and where he later on was involved in a collision. Certainly at the time of the injury and fat of God, Oh, this vehicle that collided with an innocent bystander. Was far away from the actual scene of where they responded to, but the court found that it was a continuum that in responding to the actual scene and directing the movements was a continuum of enforcing the law. And that's the present issue here, your honor. They want to take this position. And I think it's unconscionable for anyone to believe that these officers were trying to help him, that these officers were exercising a caretaking function council for a Pelly keeps saying he accepted a ride. He was brought to the back of a police car. He asked to stay at the hospital. They made it very clear. You cannot stay here. They were there to enforce the law. They put him in the back of a squad car. He was unfree. His movements were restricted. Deputy chief Davis admits to that and then drove him to a location that he was unaware of. He didn't accept a ride to be left in crisis alone and instructed to walk down a street. The officers make it very clear outside of his presence. When the door is closed, when Sergeant DeLitto instructs officer club to drive him, but then very instructive inside the hospital. He, I don't want to use the word brags, but he almost takes some sort of pride in indicating, you know, we're tired of Orland park, bringing people here, meaning to silver cross hospital, which certainly is right. When you're dealing with somebody that needs medical help, you bring them to a nearby hospital, admitting that the Orland park community and the new Lennox community are both served by silver cross. And I've instructed one of my deputies to dump him at the scene very quickly. Your honor, the discretionary policy. War will be city of Chicago. W R O B E L. Every employee action requires some discretion, but discretionary immunity that the village of new Lennox relies upon is actually developing policies and procedures for the actual community and utilize discretion. When the officers devise this plan, they certainly were not devising policy. And if anything, the officers were going against the policies of the new Lennox police department, specifically the civil commitment policy. It's certainly not the policy of the new Lennox police department. And let's hope so to take somebody in crisis, drive them to an area they don't know at night, leave them there. And when the person says, can you help me twice, tell them, this is as far as we can take you and instruct him to walk down a road. This was not an issue of a transition judge. Rippy came to that conclusion, which simply was error. The case law looks to determine on the time of response where the officers executing enforcing the law. If there was a case where it indicates that at some point there's a transition, no case has been cited or relied upon by the appellee. And that's why Fedagato was so instructive here. Cause the court found that time had passed when this drunk driver who was involved clearly with this fight, with his wife drove away, the officers weren't with him at the time. Certainly the officers were not with Kusai El-Kafween when he was hit by a car, but it's the officers bringing him to this location and execution and enforcement of the law. And they didn't bring them him there because he wanted to go there. He wasn't, he didn't ask to be taken there. They brought him there because they removed him in execution of the law. And then for some reason, it's very clear in their own chief admits, they were freshened with Orland park. It's almost some sort of active retribution against the Orland park police department of you brought this young guy that's given us an issue in our community. Let's bring them right back into your community. And it's very clear that this was a removal. Kusai indicates he'd like to go back into the hospital and they make it very clear. You can't stay here. They knew he was in crisis. Both officers admit to that. So there's certainly at the very least is a genuine issue of material fact as to whether or not the officers within Kusai, within their control in the back of a locked police car were executing and enforcing the law at the time they brought him to this parking lot and then controlled his movements. And that. We've heard this on and on and on. This is fine. Yes, sir. But can I change the fact pattern for you a little bit? It's a seven 11 store. And the gentleman is, as you say, experiencing a crisis. Phone call is made by the owner of the store saying this, this gentleman is causing a disturbance or he's likely to, you know, injure somebody, whatever you want to say, but he's having a crisis. He's not right. Police officer goes to the seven 11 walks in and removes the gentleman from the seven 11. Okay. Now as a law exam, I say, well, what could he be charged with? Okay. You can go trespass, whatever, but let's say best courts that gentleman puts him in the car and says, you know, I want to take you down the road and lets him out. Is that community caretaking justice? One of the facts that I would need to know as to whether or not the trespassing or because the person saw somebody that might need professional help and said, there's somebody in my store. I'm a clerk of a seven 11. This person needs help in the latter section. If the clerk called and said, there's somebody here. That's could be a danger to himself. We need some help. And the officer came in and aid and protection service, then certainly four one Oh two would apply. But to the contrary, if the clerk called and said, there's somebody here, he's trespassing. Oh, okay. Well, that's, that's your case right now. Correct. So, so to answer your question in this. Okay. So that's the distinguishing from my bad example here. Does that distinguish from where we are here in this fact pattern? It certainly does. And in the sub judice, your honor, silver cross called for a removal of a trespass complaint. And the officers admit and their own reports admit they weren't there to give somebody a ride or help the person or calm them down. They were there to remove someone in execution enforcement of a criminal trespass complaint, which is well documented. And the problem I'm having is community caretaking services is a very ambiguous term. What falls within that? That's, is it even, is it, is it even a good word to be using? What does it mean? Well, justice, I share that opinion. And I think the third district does too in finding that it's a jury determination as to whether or not 4, 1 0 2 or 2 2 0 2 in quoting Andrade, it's typically a question of fact, because it's an analysis a jury has to develop and come to a conclusion. Okay. Thank you. Your time has expired, but any questions from the court? No further. I just want to thank justice Peterson, justice Stavenport and justice Holdridge. I appreciate your time and attention to this case and the opportunity. This is actually my first appellate argument in my career. I appreciate you giving me this opportunity as a somewhat young lawyer at 40 years old. You're still quite young. Well, I want to thank counsel both for your fine arguments in this matter. Interesting case, and it will be taken under advisement and a written disposition shall issue.